## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| GEOMC CO., LTD., | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 3:14-cv-01222 (VAB) |
| | : | |
| CALMARE THERAPEUTICS, | : | |
| INCORPORATED, | : | |
| Defendant. | : | |

## RULING RE: PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

GEOMC Co., Ltd. ("Plaintiff," or "GEOMC") filed this lawsuit on August 22, 2014 and

claims that Calmare Therapeutics, Incorporated ("Defendant," or "CTI") failed to pay for or

return certain medical devices that GEOMC manufactured and supplied to CTI.  Complaint, ECF

No. 1; Sec. Am. Compl., ECF No. 137.  CTI raises several affirmative defenses and

counterclaims, including claims that GEOMC has already been paid all amounts owed and that

the contractual agreement for repossession of the devices is invalid.

GEOMC now moves for summary judgment on all claims.  As explained in further detail

below, GEOMC's motion is **GRANTED IN PART AND DENIED IN PART.**

As to GEOMC's breach of contract claim, the motion is GRANTED with respect to

CTI's liability for failing to pay GEOMC for the medical devices sold after 2011, and the motion

is DENIED with respect to CTI's liability for any medical devices that have not been sold.  The

motion is GRANTED as to GEOMC's claims of replevin, wrongful detention, conversion, and

unjust enrichment, and the motion is DENIED as to GEOMC's claim under the Connecticut

Unfair Trade Practices Act ("CUTPA").  Disputes related to the amount of damages owed under

the applicable contracts will be determined at trial.

# I.  STATEMENT OF FACTS[1]

GEOMC Co., Ltd. ("GEOMC"), formerly known as Daeyang E&C Co., Ltd., is a South Korean corporation with its principal place of business in South Korea.  L.R. 56(a)(1) ¶¶ 1-2.  GEOMC manufactures, distributes and sells medical devices.  *Id.*  Calmare Therapeutics Incorporated ("CTI"), formerly known as Competitive Technologies, Inc., is a Delaware corporation with its principal place of business in Connecticut.  *Id.* at ¶¶ 3-4.

## A.  Agreements Regarding Medical Devices

In October 2007, GEOMC and CTI entered into a "Territory Exclusive License Agreement for Intellectual Property" ("2007 Agreement").  *Id.* at ¶¶ 5-7.  The 2007 Agreement granted GEOMC an exclusive, worldwide license to manufacture and supply certain medical devices ("the Devices") that incorporated a patented pain management technology.  *Id.*; 2007 Agreement, Oh Dec. Ex. A, ECF No. 171-1.

The language of the 2007 Agreement provides for profit-sharing between GEOMC and CTI in connection with the sales of the Devices: "DAEYANG [(GEOMC)] and CTT [(CTI)] will share profits of 50% each from sales of Licensed Products produced by DAEYANG."  *Id.* at ¶ 3.2.  The agreement also provides that "[p]ayments of royalties shall be made in United States Dollars within thirty (30) days following the end of each monthly royalty period, and such payments shall include all royalties that have accrued during said monthly period."  *Id.* at ¶ 4.2.  Therefore, under the 2007 Agreement, if CTI sold a number of Devices in a given month, CTI would owe GEOMC fifty per cent (50%) of the sale price for those Devices at the end of the month.

---

[1] The following facts are undisputed unless indicated otherwise.

The 2007 Agreement also required GEOMC to perform a regular accounting detailing the quantity and prices of all Devices sold: "All royalty payments hereunder shall be accompanied by a report certified by an officer of DAYEANG setting forth the quantity and prices of Licensed Product sold by DAEYANG. Such report shall also be made if no royalties are due in any such monthly period." *Id.* at ¶ 4.3. The agreement does not specify any corresponding requirement for CTI to provide GEOMC with any such reports regarding Devices sold by CTI. CTI alleges that GEOMC never provided CTI with any of the reports required under this agreement. L.R. 56(a)(2) at p. 20.

The following year, in August 2008, GEOMC and CTI entered into another agreement entitled "Distributor Appointment in Korea" ("2008 Distributor Appointment"). L.R. 56(a)(1) ¶ 8; 2008 Distributor Appointment, Oh Dec. Ex. B, ECF No. 171-2. Relying on the language of the more detailed 2007 Agreement, the 2008 Distributor Appointment succinctly provides as follows: "Pursuant to the Territory Exclusive License Agreement of the Pain Management Device made October 17, 2007 between Competitive Technologies, Inc. (CTT) and GEOMC, both parties agree that CTT delegates GEOMC to designate the exclusive distributor for the Korea under the same conditions set forth in the Agreement." *Id.*

The 2008 Distributor Appointment does not specify any particular entity or entities that GEOMC must appoint as the "exclusive distributor" in Korea, nor does it separately address the division of royalty payments or reports. *Id.* Following this agreement, GEOMC appointed itself as the exclusive distributor for the devices in Korea. L.R. 56(a)(1) ¶ 8. Since that time, CTI claims that GEOMC has not specified the exact number of devices sold in Korea, nor has GEOMC made any payments to CTI in connection with sales of devices in Korea. L.R. 56(a)(2) p. 19.

In January 2010, the parties agreed to amend the payment mechanism that was outlined in the 2007 Agreement. L.R. 56(a)(1) ¶¶ 9-10. GEOMC and CTI executed a Memorandum of Understanding ("2010 MOU") providing that "GEOMC will receive $9,000 for the sale of each unit" instead of dividing the proceeds by fifty per cent.[2] 2010 MOU, Oh Dec. Ex. C, ECF No. 171-3. The 2010 MOU was signed by John B. Nano, CTI's President and Chief Executive Officer ("CEO") at the time, and Young H. Lim, GEOMC's President and CEO at the time. *Id.*

In April 2011, the parties again adjusted the agreed-upon price that CTI would pay GEOMC for each device sold, increasing the per-unit payment amount from $9,000 to $10,000. L.R. 56(a)(1) ¶ 11. This increase was not memorialized in a written agreement, but both parties acknowledge that GEOMC and CTI agreed to increase the payment price to $10,000 per unit in April 2011.[3] L.R. 56(a)(2) ¶ 11.

Under the 2007 Agreement and subsequent amendments, GEOMC shipped a total of 691 Devices to CTI between 2008 and 2013.[4] L.R. 56(a)(1) ¶ 13. The parties agree as to the number of units shipped during this period; however, they disagree as to how much money has been paid between the parties for these devices, and whether the amount paid satisfies the parties' obligations under the governing agreements.

### B. Financial Troubles and Block Payments

According to GEOMC, CTI began experiencing "cash flow" problems at some point during the course of the parties' relationship. *Id.* at ¶¶ 19-20; Oh Dec. ¶ 12, ECF No. 171. In

---

[2] The language of the 2010 MOU does not specify whether this payment adjustment impacts the treatment of sales in Korea under the 2008 Distributor Appointment, nor does it specify the timing of payments owed under this adjusted arrangement.

[3] The parties disagree as to whether the 2007 Agreement as amended requires payment to be made upon delivery of the devices in question or only after those devices are sold.

[4] This number does not include any devices that CTI returned to GEOMC after determining that they were defective. Oh Dep. at 201:2-13, Pl. Ex. AF, ECF No. 172-22.

order to help accommodate CTI's situation, GEOMC claims that it allowed CTI to make certain block payments. *Id.* GEOMC does not specify the timing or amount of such payments.

CTI, on the other hand, disputes GEOMC's characterization of CTI's financial trouble. L.R. 56(a)(2) ¶¶ 19-20. According to CTI, GEOMC was experiencing financial trouble, not CTI, and in order to accommodate GEOMC's needs, CTI made block payments to GEOMC between 2008 and 2012 that overrepresented the amounts owed under the contract. *Id.* at p. 20. According to a document sent from Mr. Johnson to Mr. O'Connell in 2013 regarding the status of the accounting for GEOMC devices, CTI paid GEOMC an advance of $147,000 for design work in August 2008, $100,000 in September 2009, and another $100,000 in 2010. *Id.*; Johnson E-mail, Weil Dec. Ex. W, ECF No. 172-13.[5] GEOMC disputes the specific amounts alleged by CTI in connection with those block payments, and GEOMC also disputes their characterization as "overpayments." Pl. Repl. Br. at 4-6, ECF No. 178.

The parties do not dispute that, since January 1, 2012, CTI has sold 61 devices under the 2007 Agreement as amended.[6] L.R. 56(a)(1) ¶ 55. The parties also do not dispute that CTI has not made any payments to GEOMC in connection with any sales of devices since December 31, 2011. *Id.* at ¶ 56.

### C. Security Agreement

In May 2012, approximately five months after CTI ceased making payments under the 2007 Agreement, the parties entered into a "Security Agreement" agreement regarding the devices ("2012 Security Agreement"). 2012 Sec. Agreement, Oh Dec. Ex. E, ECF No. 171-5. The terms of this agreement granted GEOMC a security interest in the following identified

---

[5] That same document states that sales of devices as of 2012 totaled "$280,000, or 28 units." *Id.*

[6] At oral argument, counsel for CTI disputed the accuracy of this number. However, CTI's Local Rule 56(a)(2) statement unequivocally confirms that 61 devices were sold after 2011. *See* L.R. 56(a)(2) ¶ 55. The Court relies on the representations made in these filings in analyzing GEOMC's motion for summary judgment.

"collateral": "273 Calmare devices located in the Company's warehouse located at… Stratford, CT" as well as "120 devices located in the Company's warehouse located at… Charlotte, NC[.]" *Id.* at ¶ 2.

The agreement specifies several "events of default" that would trigger this security interest, including the "failure of the Company to pay any of the amounts due under the Obligations as and when due and payable." *Id.* at ¶ 8(a). If an event of default occurs under the agreement, GEOMC may "declare the unpaid balance of any Obligations to be immediately due and payable" or it may require CTI to "assemble the Collateral and make it available to Supplier[.]" *Id.* at ¶ 9.

The 2012 Security Agreement also specifies that CTI is required to maintain insurance on the specified collateral. *Id.* at ¶ 6 ("The Company will insure the Collateral against all insurable casualties and risks. The Company will pay all premiums due or to become due for such insurance."). GEOMC insists that CTI never maintained such insurance, *see* L.R. 56(a)(1) ¶ 32, while CTI contests that it did provide the requisite insurance. *See* L.R. 56(a)(2) at p. 22; Insurance Policy Renewal and Invoice, Mir Dec. Exs. A-B, ECF Nos. 176-1, 176-2.

Johnie D. Johnson, CTI's acting CEO at the time, signed the 2012 Security Agreement and Ms. Lim, who was still serving as GEOMC's President and CEO, signed on behalf of GEOMC. 2012 Sec. Agreement, Oh Dec. Ex. E, ECF No. 171-5. The text of the agreement includes explicit assurances that the agreement is binding on both corporate entities and that the signatories have the requisite authority to sign on behalf of each company: "This Agreement… ha[s] been properly executed on behalf of the Company and, upon execution by the Supplier, this Agreement and the related documents and the transactions contemplated by it, will be the valid and binding obligation of the Company, fully enforceable against the Company in accordance

with their respective terms…." *Id.* at ¶ 4(d).  Following the execution of the agreement,

GEOMC's security interest in the specified devices was documented in a UCC-1 Financing

Statement that CTI, acting through its CEO Johnie Johnson, filed with the State of Connecticut.

UCC-1 Statement, Oh Dec. Ex. G, ECF No. 171-7.

According to GEOMC, an event of default has occurred under the 2012 Security

Agreement because, since December 31, 2011, CTI has failed to pay the required $10,000 price

per device, as required under the adjusted 2007 Agreement.  L.R. 56(a)(1) ¶¶ 30, 57-58.  Based

on CTI's alleged failure to make the required payments, GEOMC demanded the return of all

devices identified as collateral under the 2012 Security Agreement.  *Id*.  CTI has refused to

return the devices to GEOMC.  *Id*.

CTI does not contest any of the written terms of the 2012 Security Agreement.  Rather,

CTI argues that it is not required to return the devices because the 2012 Security Agreement is

wholly invalid and is not binding on CTI.  L.R. 56(a)(2) pp. 20-21.  CTI specifically claims that

Johnie Johnson, the acting CEO of CTI at the time of the 2012 Security Agreement, breached his

fiduciary duties by entering into the 2012 Security Agreement without full Board approval; thus,

CTI is not required to comply with the terms of the agreement.  *Id.*

### D.  Revocation of Security Agreement

CTI explains that Johnie Johnson became "interim-CEO of CTI" in September 2010.

L.R. 56(a)(2) ¶ 14, p. 20.  CTI states that he assumed this role "without full board approval,"

although they do not assert that full board approval was required in order for Mr. Johnson to

validly hold this title.  *Id.*  Mr. Johnson's term as CEO lasted for about two years, until

November 1, 2012 when he was formally replaced by Carl O'Connell.[7]  L.R. 56(a)(1) ¶ 14.  Mr.

---

[7] Mr. Johnson also served as CTI's Chief Financial Officer ("CFO") from September 2010 until September 2013.
L.R. 56(a)(1) ¶ 14.

O'Connell resigned from the CEO position in September 2013, and Conrad Murray replaced him as CEO at the end of that month. *Id.* at ¶ 15.

In Mr. Johnson's capacity as CEO and CFO for CTI from 2010-2012, he took the lead in negotiating the 2012 Security Agreement and other business dealings with GEOMC on behalf of CTI. L.R. 56(a)(1) ¶ 18. CTI's Bylaws grant such authority to Mr. Johnson in his capacity as CEO, stating in relevant part that "[e]ach of the CEO, the CFO and the COO shall have the power on behalf of the Corporation to execute and deliver all contracts, instruments, conveyances or documents and to affix the corporate seal thereto." Am Bylaws, Weil Dec. Ex. T, ECF No. 172-10.[8] During his term as CEO, Mr. Johnson also made several filings with the Securities and Exchange Commission ("SEC") which he signed on behalf of CTI. L.R. 56(a)(1) ¶ 17; Mir Dep. at 220:8-13, Weil Dec. Ex. AI, ECF No. 172-25.

Mr. O'Connell, Mr. Johnson's immediate successor as CEO of CTI, knew about the 2012 Security Agreement when he took on the role of CEO, and he wrote to Mr. Johnson about the details of the various agreements between CTI and GEOMC. L.R. 56(a)(1) ¶ 42; July 2013 E-mails, Weil Dec. Ex. U, ECF No. 172-11. Mr. O'Connell discussed the agreement with CTI's Board of Directors as well. Mir. Dep. at 204:11-22, Weil Dec. Ex. AI, ECF No. 172-25.

On February 10, 2014, after Mr. Mir had replaced Mr. O'Connell as CEO of CTI, the Board of Directors determined by unanimous written consent that Mr. Johnson "may have acted contrary to the best interest of the Company and its stockholders in connection with certain contracts, agreements, initiatives or other actions Johnson entered into." L.R. 56(a)(1) ¶ 48, Written Board Consent in Lieu of Meeting, Weil Dec. Ex. X, ECF No. 172-14. CTI's Board of Directors declared that several contracts entered into by Mr. Johnson, including the 2012

---

[8] The Bylaws do not specify that full board approval is needed in order for such contracts to be valid and binding on the company. *Id.*

Security Agreement, were retroactively "rendered unauthorized, rejected, and void. *Id.* CTI then issued a Form 8-K in March 2014 stating that "Johnson did not have the authority to act on behalf of the Company in connection to the Actions" and "authoriz[ing] certain officers to take all measures appropriate and necessary to nullify the Actions." L.R. 56(a)(1) ¶ 49; March 2014 8-K, Weil Dec. Ex. Y, ECF No. 172-15. Relying on this written consent and subsequent filing, CTI now insists that it is not bound by the terms of the 2012 Security Agreement.

### E. Devices Delivered and Amounts Paid

GEOMC claims that CTI has maintained in its possession all of the collateral identified in the 2012 Security Agreement: 273 devices in Stratford, Connecticut and 120 devices in Charlotte, North Carolina. L.R. 56(a)(1) ¶ 58. CTI acknowledges that, as of January 3, 2017, it possesses a total of 399 devices at its warehouse in Stratford, Connecticut. *Id.* at ¶ 53. Between 2008 and 2016, CTI admits that it has "sold, leased, or otherwise disposed of" a total of 267 devices. *Id.* at ¶ 54. CTI sold 61 of those devices after December 31, 2011, but CTI has not made any payments to GEOMC in connection with those post-2011 sales. *Id.* at ¶¶ 56-57.

The parties disagree as to specific amounts paid and amounts owed under the 2007 Agreement and subsequent amendments. GEOMC claims that CTI currently owes GEOMC $4,673,406 for the devices. *Id.* at ¶ 60. To support this claim, GEOMC relies on a spreadsheet it prepared listing all devices provided to CTI between September 2008 and June 2013, as well as related costs. GEOMC Accounting, Oh Dec. Ex. J, ECF No. 171-10.[9] GEOMC also refers to CTI's publicly filed Form 10-Q, Amendment No. 1 for the quarterly period through September 2016, which lists the figure $4,182,380 next to the phrase "Accounts Payable, GEOMC." *Id.* at ¶

---

[9] CTI contests the authenticity and accuracy of this spreadsheet.

62.  That same figure is listed under "Accounts Payable, GEOMC" in CTI's 10-Q dated March 2013.  *Id.* at ¶ 63.

CTI insists that this figure does not reflect the amount owed to GEOMC for the devices. L.R. 56(a)(2) ¶¶62-63.  Instead, CTI claims that it does not owe GEOMC anything under either the 2007 Agreement, that agreement's subsequent amendments, or the 2012 Security Agreement.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has carried that initial burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).  If no reasonable jury could find in favor of the opposing party because "the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue of fact is material if it "might affect the outcome of the suit under the governing law . . . ." *Id.* Disputes concerning immaterial facts do not prevent summary judgment. *See id.*; *Howard v. Gleason Corp.*, 901 F.2d 1154, 1159 (2d Cir. 1990) ("[S]ummary judgment cannot be avoided by immaterial factual disputes.").

When ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party and draw all inferences in its favor. *Dalberth v. Xerox Corp.*, 766 F.3d 172, 182 (2d Cir. 2014).

## III.     DISCUSSION

The Second Amended Complaint seeks equitable relief, compensatory and punitive damages, and related costs under the following state law causes of action: (1) replevin; (2) wrongful detention under Conn. Gen. Stat. § 52-515; (3) conversion; (4) Connecticut Unfair Trade Practices Act ("CUTPA"); (5) Unjust Enrichment; and (6) Breach of Contract.  Sec. Am. Compl., ECF No. 137.

GEOMC seeks summary judgment with respect to all claims, as the parties do not dispute that (1) CTI has not fully compensated GEOMC for medical devices under the 2007 Agreement, and (2) CTI has not returned numerous devices to GEOMC as required under the Security Agreement.  Pl. Mot. for Summ. J., ECF No. 169.  CTI, however, claims that it is not liable for any of GEOMC's claims, arguing that (1) contrary to GEOMC's accounting, CTI does not owe GEOMC any money under the 2007 Agreement, and (2) CTI does not have to return any devices to GEOMC because there was no event of default and the 2012 Security Agreement was not valid and thus, is not binding.

For the reasons stated below, GEOMC's motion is granted in part and denied in part as to the breach of contract claim.  GEOMC's motion is granted as to the various claims arising under the Security Agreement, including claims for replevin, wrongful detention, conversion, and unjust enrichment, and denied as to CUTPA.  Each claim is examined in further detail below.

## A. Breach of Contract

GEOMC claims that CTI breached the terms of the 2007 Agreement for the purchase of certain devices by failing to fully compensate GEOMC for the devices that were delivered under that contract. The parties do not dispute that the 2007 Agreement was updated in 2010 and 2011 to require a payment to GEOMC of $10,000 for each device sold by CTI. It is also undisputed that, although CTI has sold at least 61 GEOMC devices to end users since January 1, 2012, CTI has not made any payments to GEOMC since December 31, 2011.

"The elements of a breach of contract claim are the formation of an agreement, performance by one party, breach of the agreement by the other party, and damages." *Meyers v. Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C.*, 311 Conn. 282, 291 (2014).[10] "The law concerning when a breach of contract action accrues is well settled… '[T]he cause of action is complete at the time the breach of contract occurs, that is, when the injury has been inflicted.'" *Tolbert v. Connecticut Gen. Life Ins. Co.*, 257 Conn. 118, 124 (2001) (quoting *Kennedy v. Johns-Manville Sales Corp.*, 135 Conn. 176, 180 (1948)).

GEOMC claims that CTI indisputably breached the terms of the 2007 Agreement, as amended by subsequent agreements between the parties, by failing to pay GEOMC for delivered devices in the amount of $4,673,406. The formation of the 2007 Agreement and the agreed-upon price for each device are not in dispute, thus establishing the first element of a breach of contract claim. L.R. 56(a)(2) at ¶¶ 5-11. The second element of a breach of contract claim is also satisfied here, as GEOMC offers undisputed evidence that, between 2008 and 2013, GEOMC shipped a net number of 691 devices to CTI, indicating sufficient performance of GEOMC's

---

[10] Under the terms of the 2007 Agreement, the contract is to be "governed by and construed in accordance with the law of the State of Connecticut and the United States…." 2007 Agreement, Pl. Ex. A, ECF No. 171-1. Accordingly, the Court applies Connecticut law to the parties' state law claims.

contractual duties under the 2007 agreement.[11]  *Id.* at ¶ 13; Oh Dep. at 200:12 - 201:13, Weil Dec. Ex. AF, ECF No. 172-22.  As there is no material dispute with respect to the first two elements of a breach of contract claim, the resolution of this claim hinges on the third element — whether CTI breached the contract by failing to pay for all of the delivered devices.

CTI admits that it has not paid GEOMC for all of the devices that have been delivered under the 2007 Agreement.  L.R. 56(a)(2) at ¶ 11, 56-57, ECF No. 177.  CTI argues, however, that it does not owe GEOMC anything under the governing agreements because (1) the agreements do not require payment upon delivery of the devices, but only after the completion of sales to third parties, and (2) GEOMC fails to account for amounts owed to CTI by GEOMC throughout the course of the dealings between the parties.

### 1.  Timing of Payment

CTI argues that the 2007 Agreement and subsequent amendments do not require payment upon delivery of the devices, but rather upon the completion of sales to third parties.  *Id.* at ¶ 12 ("The 'Supply Agreement' and MOU conditioned payment to GEOMC upon sale and receipt of payment from third parties.  The agreements did not place time frame upon sale of devices.").  According to CTI, it has not sold the majority of the 691 devices that were delivered under the contract, thus, regardless of how long CTI has kept those devices, CTI does not owe GEOMC any money for devices that have not been sold.

GEOMC, on the other hand, argues that payment was due upon delivery, therefore CTI is required to pay GEOMC even for devices that have not been sold.  In support of this interpretation, GEOMC relies on the 2010 MOU, which adjusted the operative payment mechanism from a fifty-fifty royalty split to a fixed fee of $9,000 per device, which was later

---

[11] According to Oh's testimony, this number was calculated based on the delivery of 820 devices minutes the number of devices that CTI returned for being defective.  Oh Dep. at 201:2-13, Pl. Ex. AF, ECF No. 172-22.

increased to $10,000 per device. At oral argument, GEOMC explained that the devices in question would typically sell to third parties for anywhere between $45,000 and $90,000, meaning that an equal division of sale proceeds would have resulted in significantly more money to GEOMC for each device sold than a fixed fee. According to GEOMC, the only reason they accepted such a low amount per device was as consideration for CTI's commitment to pay GEOMC up front, upon delivery rather than after sale.

"A determination of contractual intent generally presents a question of fact, but where the language is clear and unambiguous, it becomes a question of law for the court." *Sartor v. Town of Manchester*, 312 F. Supp. 2d 238, 243 (D. Conn. 2004). "In contract actions involving the interpretation of contractual language, summary judgment is appropriate only when the language of a contract is wholly unambiguous when considered in light of the surrounding circumstances and undisputed evidence of intent." *Id.* (citing *Orange Improvements P'ship v. Cardo, Inc.*, 984 F.Supp. 85, 89 (D. Conn. 1997)).

The applicable contract terms regarding the timing of payment are ambiguous here. The 2007 Agreement is structured as a licensing agreement. 2007 Agreement at ¶ 4.2, Oh Dec. Ex. A, ECF No. 171-1. Before the agreement was adjusted to provide for payment of a fixed amount per device, the contract originally structured payments as "royalties" calculated at "50% each from sales of Licensed Products." *Id.* The subsequent amendments to the 2007 Agreement, however, do not reference the timing of payment. *See* 2010 MOU, Oh Dec. Ex. C, ECF No. 171-3; L.R. 56(a)(1) ¶ 11. As the amount of payment was originally tied to the sale of the products in question, the written contractual language supports the notion that payments were due after the completion of sales to third parties, not upon delivery of the devices. The Securities and Exchange Commission ("SEC") Form 8-K filed by CTI in April 2010, however, indicates

that "no payment other than a $1,000 license fee was due under the agreement until units are delivered[,]" suggesting that delivery, not sale, was understood to be the triggering event for payment. Apr. 2010 CTI Form 8-K, Second Oh Dec. Ex. F, ECF No. 179-6. Together with GEOMC's representations regarding the payment amounts relative to the sale price of the devices in question, the Court finds that there is ambiguity as to when payments were due under the contract, and whether CTI was obligated to ultimately pay for all devices delivered or only for those that were sold.

The specific question of when payments were due under the contract, then, is a genuine dispute that is best resolved at trial. *See Sartor,* 312 F.Supp.2d at 243. At this stage of the case, consideration of summary judgment, the Court examines the remainder of GEOMC's arguments, based on the assumption that the event triggering payment under the contract is sale to third parties, rather than delivery of the devices to CTI. *See Dalberth*, 766 F.3d at 182 (requiring courts to draw all inferences in favor of the non-moving party when considering motions for summary judgment under Rule 56).

Nevertheless, GEOMC argues that, even assuming that payment is not required until after devices are sold to third parties, CTI is not permitted to retain unsold devices indefinitely without paying for those devices. Pl. Mem. in Supp. at 13-14, ECF No. 170. According to GEOMC, Connecticut law requires that "a reasonable time limit must be implied" where contractual agreements fail to include an express time limit. *Id*.

In support of this argument, GEOMC cites to a Connecticut Superior Court case, *R & L Acoustics v. Liberty Mut. Ins. Co.*, CV00038056S, 2001 WL 1249658 (Conn. Super. Ct. Sept. 27, 2001). In that case, the court examined a contract for construction work between a general contractor and an insurance company. *Id.* The contract at issue included a clause requiring the

general contractor to pay the subcontractor only after the general contractor had received payment from the insurance company.  *Id.* at *3.  Citing several other Connecticut cases as well as cases from other jurisdictions, the court found that this "pay-when-paid" clause was not enforceable as a condition precedent to payment, concluding instead that the clause "operates to postpone [the general contractor's] obligation to pay the plaintiff for a reasonable time after the plaintiff's requisition for payment…."  *Id.* at *7.

GEOMC relies on *R & L Acoustics* to argue that, if the contract here requires CTI to pay GEOMC only upon completion of the sale of the delivered devices, some reasonable time period for such payment must be imposed to ultimately require payment for all devices that are provided to CTI under the contract.  Pl. Mem. in Supp. at 14, ECF No. 170.  GEOMC's reliance on *R & L Acoustics*, however, is misplaced.  The text of that ruling specifies that the imposition of a reasonable time frame, rather than strict adherence to a "pay-when-paid" contract provision, is limited to contexts where the event of payment is certain to take place:

> Where an instrument purports to be payable upon the happening of a certain event, the question which must precede any inquiry as to the time of payment, assuming the event has not happened, is whether the instrument imports an absolute liability. If the event is one that is certain to happen, the mere promise to pay may import such an absolute liability. If, however, the event is one wholly or partially within the promisor's control and therefore not certain to happen, the absolute character of the liability cannot be inferred from the mere promise, but must be sought in the other terms of the instrument or in extrinsic circumstances ... If the instrument, read in the light of the surrounding circumstances, shows that the debt is an absolute one, it is reasonable to suppose that the parties intended that a reasonable effort should be made to cause the event to happen within a reasonable time.

*Id.* at *6 (quoting 14 S. Williston, Contracts (4th Ed.2000) § 42:7, pp. 400-01); *see also Schwartz v. Family Dental Grp., P.C.*, 106 Conn. App. 765, 772 (2008) ("There is a strong public policy in Connecticut favoring freedom of contract… This freedom includes the right to contract for the

assumption of known or unknown hazards and risks that may arise as a consequence of the execution of the contract.").

"Determining whether the non-occurrence of a particular event was or was not a basic assumption involves a judgment as to which party assumed the risk of its occurrence.... In making such determinations, a court will look at all circumstances, including the terms of the contract." *DeCarlo & Doll, Inc. v. Dilozir*, 45 Conn. App. 633, 641 (1997) (imposing reasonable time frame for payment based on finding that "the clause 'subject to payment with all outstanding payments to be paid in full at time of financing' was not a condition on which payment was contingent… this obligation was in the control of the defendant, and, therefore, he will not be excused by his nonperformance").

Here, there is a genuine dispute of material fact as to whether GEOMC assumed the risk that not all devices would be sold. If GEOMC did assume this risk, it would not be appropriate for the Court to require CTI to pay for all delivered devices within a "reasonable" time frame regardless of whether those devices were ultimately sold. The underlying licensing agreement between GEOMC and CTI provides for the payment of royalties for products that are sold. *See* 2007 Agreement, Oh Dec. Ex. A, ECF No. 171-1. Thus, based solely on the language of the 2007 Agreement, the event triggering payment - the sale of the devices to third parties - is not certain to happen, suggesting that the risk that not all devices delivered would be sold was a risk that GEOMC chose to bear by agreeing to the arrangement for royalties.

Drawing all inferences in favor of the non-moving party, as is required at this stage, the contract language could support CTI's contention that payment is not due until the devices in question are actually sold to third parties, and the Court declines to conclude at this time that a reasonable time limit for payment must be imposed as a matter of law in this case. Thus, to the

extent that GEOMC seeks as a matter of law to hold CTI liable for breach of contract based on CTI's failure to pay for devices that were never sold, GEOMC's motion for summary judgment is denied.[12]

## 2. Amount of Payment

Even when the 2007 Agreement and related amendments are interpreted to require payment for devices only upon the completion of sales to third parties, however, the undisputed facts still support a finding that CTI has not paid GEOMC the full amount owed under the 2007 Agreement, thus breaching the contract terms. Both parties acknowledge that, between January 1, 2012 and December 31, 2016, CTI has sold a total of 61 devices to end users. L.R. 56(a)(2) ¶ 55, ECF No. 177. The parties also both acknowledge that CTI has not made any payments to GEOMC since December 31, 2011. *Id.* at ¶¶ 56-57. Under the plain language of the governing agreement, CTI should have paid GEOMC $10,000 for each of those sales, totaling $610,000. *See* L.R. 56(a)(1) ¶ 11. GEOMC alleges that CTI's failure to pay for those 61 devices alone is sufficient to support summary judgment on its breach of contract claim.

Despite CTI's admitted failure to compensate GEOMC following the post-2011 device sales, CTI insists that it does not owe money to GEOMC under the 2007 Agreement. According to CTI, it has no remaining financial liability because (1) CTI had previously overpaid GEOMC in several lump sum payments, and (2) GEOMC has not properly paid CTI for sales made by GEOMC in Korea under the Korea Agreement, further offsetting any amounts owed by CTI.

---

[12] The parties' briefs include detailed discussions debating the accuracy of GEOMC's calculations regarding the exact amounts owed under the governing agreements, particularly the accuracy and admissibility of GEOMC's spreadsheet documenting amounts allegedly owed by CTI. GEOMC Accounting, Oh Dec. Ex. J, ECF No. 171-10. These disputes include payment allegations regarding devices that were delivered to CTI but not sold to third parties. *Id.* As the Court has denied summary judgment regarding CTI's liability for devices that were never sold, the Court declines to take up these arguments now.

For the reasons outlined below, neither of these arguments absolve CTI of its contractual obligation to pay GEOMC for the sales of devices made since 2011.

### i.  Alleged Overpayments

CTI claims that any allegations made by GEOMC regarding amounts owed under the 2007 Agreement are invalid because they fail to account for advance payments made by CTI earlier on in the course of its agreement with GEOMC.  Def. Mem. in Opp. at 13-14, ECF No. 175.  GEOMC disputes the validity of these alleged "overpayments"; nonetheless, GEOMC argues that, even if CTI did make the stated payments, CTI would still owe money under the contract based on the volume of post-2011 sales.

The only documentation offered by CTI in support of its claimed overpayments is a single e-mail from CTI's former CEO, Johnie Johnson, to his successor, Carl O'Connell.  Johnson E-mail, Weil Dec. Ex. W, ECF No. 172-13.  This document is ambiguous as to the status of any "overpayment" as of the end of 2012 – the language of Mr. Johnson's letter states that CTI "overpaid based on sales at the end of 2012 about $280,000, or 28 units." *Id.*  According to this language, it is unclear whether the $280,000 figure is intended to refer to the amount owed to GEOMC based on the sale of 28 units, which would be reasonable based on the $10,000-per-unit price under the governing contractual agreement, or whether the $280,000 figure refers to the amount by which CTI overpaid GEOMC, as CTI now seems to assert.[13]

Under the 2011 revisions to the 2007 Agreement, it is undisputed that CTI agreed to pay GEOMC a total of $10,000 for each device sold to end users, L.R. 56(a)(2) ¶ 11, and that CTI

---

[13] This alleged $280,000 overpayment is not mentioned in CTI's answer to the Second Amended Complaint. Answer, ECF No. 138.  The only counterclaim pertaining to any overpayment on the part of CTI describes an overpayment of only $32,000.  *Id.* at ¶¶ 143-147.  Furthermore, the 30(b)(6) deposition testimony of Conrad Mir, CTI's CEO, includes an admission that CTI owes GEOMC money, not the other way around.  Mir Dep. 195:15-19, Weil Dec. Ex. AI, ECF No. 172-25 ("Q. It is CTI's position today that it is not owed $32,000 by GEOMC, but rather that CTI owes GEOMC money; am I understanding you correctly? A. That is correct.").

sold 61 devices since 2011, *id.* at ¶ 55. According to the governing contract terms, this should have resulted in payments totaling $610,000. Even if the e-mail relied upon by CTI were interpreted to suggest that CTI did "overpay" GEOMC in the amount of $280,000 by the end of 2012, the total number of agreed-upon sales after 2011 confirms that the amount owed to GEOMC by CTI far surpasses the amount potentially owed to CTI by GEOMC based on such "overpayments."

Thus, while CTI's allegations of prior overpayments appears to create a material factual dispute between the parties with respect to the specific amount of damages owed under the contract, this dispute is not material to the question of CTI's legal liability for breaching the contract by failing to make any payments at all after 2011. Here, CTI has admitted to selling 61 devices after 2011 and failing to pay any of the agreed-upon $10,000 cost for each device as required by the contract. CTI's argument that any amounts owed should be offset by up to $280,000 cannot defeat summary judgment on the question of CTI's liability for breach of contract with respect to those devices that were sold after 2011.

### ii. Korea Agreement

Alternatively, CTI argues that it does not owe GEOMC money under the agreement because GEOMC failed to compensate CTI for product sales in Korea. Def. Mem. in Opp. at 14-15, ECF No. 175. In making this argument, CTI relies on the language of the 2008 Distributor Appointment, which simply provides that "CT[I] delegates GEOMC to designate the exclusive distributor for the Korea under the same conditions set forth in the Agreement." 2008 Distributor Appointment, Oh Dec. Ex. B, ECF No. 171-2. CTI claims that, because this agreement states that GEOMC, as the "exclusive distributor," was to be appointed "under the same conditions set forth in the Agreement," GEOMC was contractually obligated to pay CTI

fifty per cent (50%) in royalties for every device sold by GEOMC in Korea, just as the 2007 Agreement originally required CTI to pay such royalties to GEOMC. *Id.* CTI does not specify the amount that GEOMC allegedly owes under this agreement, however — according to CTI, GEOMC has consistently failed to inform CTI about the number of sales completed in Korea; thus, CTI is unable to determine the specific amount owed.[14] *Id.*

GEOMC argues that CTI should not be permitted to raise this argument in the summary judgment context at all because it failed to specifically raise this claim in its Answer or its affirmative defenses. Pl. Reply Br. at 6-7, ECF No. 178. GEOMC argues that, because CTI raised this argument for the first time its opposition brief, the parties did not conduct extensive discovery on this question, and there is little evidence in the record regarding whether CTI was entitled to payments based on sales made by GEOMC in Korea. *Id.* GEOMC further asserts that, based on separate discussions between GEOMC and CTI, GEOMC had no contractual obligation to pay royalties to CTI based on sales in Korea. Second Oh Dec. at ¶ 5, ECF No. 179; Oh Dep. at 137:2-18, Second Oh Dec. Ex. A, ECF No. 179-1.

The Court finds that, regardless of the accuracy of each party's representations about GEOMC's obligations under the 2008 Distributor Appointment, CTI's allegations in connection with this arrangement are not material to the underlying question of CTI's legal liability under the 2007 Agreement for devices sold after 2011. CTI falls short of claiming that GEOMC's failure to compensate CTI for sales in Korea negates CTI's contractual obligation to pay GEOMC for sales of the contested medical devices under the 2007 Agreement as amended. Rather, CTI alleges that GEOMC's failure to pay for each sale made in Korea undermines the

---

[14] The only concrete number alleged by CTI is based on the deposition testimony of Ms. Lim, during which Ms. Lim stated that GEOMC sold approximately 30 devices in Korea from October 17, 2007 to August 22, 2014. Lim Dep. at 86:19 - 87:6, Mir Dec. Ex. F, ECF No. 176-6.

accuracy of GEOMC's accounting and offsets the amounts owed by CTI under the 2007 Agreement.[15]  Def. Mem. in Opp. at 14-15, ECF No. 175.  Accordingly, the Court finds that CTI's allegations regarding GEOMC's unfulfilled obligations under the 2008 Distributor Appointment do not impact the legal question of whether CTI breached the 2007 Agreement by failing to pay GEOMC for devices sold after 2011, but rather raises an issue with respect to damages best decided at trial.

As noted previously, in the summary judgment context, once the moving party has met its initial burden to show the absence of a genuine dispute of material fact, the burden shifts to the opposing party to present "specific evidence" demonstrating that such a dispute exists.  *Brown*, 654 F.3d at 358.  Where "the evidence to support [the opposing party's] case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo*, 22 F.3d at 1224.

Here, CTI's challenges to GEOMC's accounting cannot defeat summary judgment on the question of CTI's liability for breach of contract with respect to those devices that were sold after 2011.  Not only has CTI failed to put forth specific evidence demonstrating particular amounts that should be offset based on either previous block payments from CTI or unpaid royalties from sales in Korea; the undisputed facts confirm CTI's liability for breach of contract, regardless of any disputes about the exact amounts owed.

As indicated above, there is no dispute about the established fact that CTI has failed to make any payments directly related to the sales of at least 61 devices sold by CTI since 2011. The parties do have genuine disputes regarding: (1) whether the 2007 Agreement and subsequent amendments required CTI to pay for all devices that were delivered in addition to those that were

---

[15] The Court notes that there are no allegations in the record suggesting that CTI ever confronted GEOMC regarding its failure to make payments in connection with device sales in Korea in advance of this lawsuit.

sold; (2) whether GEOMC received several "overpayments" from CTI, and if so, in what amounts; and (3) whether GEOMC had a contractual obligation to make some royalty payments to CTI for sales of devices in Korea and, if so, in what amounts. These disputes may be material to the calculation of damages owed under the 2007 Agreement. They are not material, however, to the legal question of whether CTI breached the 2007 Agreement by failing to make any payments in connection with the 61 devices sold after 2011.

Based on the record presented and the allegations of the parties, there is no genuine dispute of material fact regarding whether CTI's failure to make any payments after 2011 constituted a breach of the 2007 Agreement. Accordingly, the Court grants summary judgment for GEOMC regarding CTI's legal liability under Count Six of the Second Amended Complaint.

Disputed factual issues remain regarding the specific amounts of damages owed to GEOMC under this contract. Accordingly, the Court declines to grant summary judgment as to damages on this count, as this issue is best resolved at trial.[16]

### B. Replevin and Wrongful Detention

The remainder of GEOMC's claims relate primarily to the 2012 Security Agreement. The plain language of this agreement allows GEOMC to demand the return of a total of 393 devices in the event that CTI fails to properly pay for the devices. 2012 Sec. Agreement, Oh Dec. Ex. E, ECF No. 171-5. As indicated above, there is no genuine dispute of material fact that CTI did breach the underlying agreement for the devices by failing to pay GEOMC for any sales made after 2011. CTI does not claim to have returned the devices, and CTI has further admitted

---

[16] In light of CTI's own admissions, there is no genuine dispute that CTI owes GEOMC a total of $61,000 for the 61 devices sold after 2011. However, the Court declines to order payment of this specific amount at this time. As GEOMC also seeks replevy of the devices in question, the appropriate monetary remedy for CTI's breach of contract is best decided together with other outstanding damages issues, including damages in connection with GEOMC's replevin claim, as discussed in further detail below.

that, as of January 3, 2017, it has 399 devices in its possession.  L.R. 56(a)(2) ¶ 53.  Accordingly, based solely on the undisputed facts and the clear language of the 2012 Security Agreement, GEOMC is entitled to the repossession of the specified devices.

Replevin is a statutory remedy under Connecticut law.  Conn. Gen. Stat. § 52-515; *see Cornelio v. Stamford Hosp*., 246 Conn. 45, 49 (1998) ("In Connecticut, replevin proceedings are governed by statute rather than by the rules that apply to common-law actions of replevin."). The statutory language provides that "[t]he action of replevin may be maintained to recover any goods or chattels in which the plaintiff has a general or special property interest with a right to immediate possession and which are wrongfully detained from him in any manner, together with the damages for such wrongful detention."  Conn. Gen. Stat. § 52-515.  In order for a plaintiff to prevail on a claim of replevin, he or she must establish that: "(1) the [disputed items] are 'goods or chattels' within the meaning of § 52–515; (2) [plaintiff] has a 'property interest' in the[m]; (3) [plaintiff] has a right to immediate possession of the[m]; and (4) the defendant has wrongfully detained the[m]."  *Cornelio*, 246 Conn. at 49.

Section 52-515 also authorizes "'the recovery of damages for ... wrongful detention.'" *O'Brien v. Rogovin Moving & Storage Co. Inc*., No. CIV 3:04-CV-1150 (WWE), 2008 WL 4480209, at *17 (D. Conn. Sept. 30, 2008) (quoting *Staub v. Anderson*, 152 Conn. 694, 695 (1965).  "Damages in such an action can be the depreciation in value of the property wrongfully detained, and loss of use of the property during wrongful detention."  *Id.* (quoting *Taylor v. Moffat*, No. CV 054017734, 2008 WL 1948036, *2 (Conn. Super. Ct. Apr.18, 2008) (internal marks omitted)).

There is no material dispute between the parties as to any of the essential elements of GEOMC's replevin and wrongful detention claims.  As discussed above, the language of the

2012 Security Agreement does provide GEOMC with a security interest in tangible goods –
namely, the 393 devices identified as collateral in the agreement – which grants GEOMC a
property interest in and a right to immediate possession of those goods in light of CTI's admitted
failure to make required payments under the 2007 Agreement and related amendments.  2012
Sec. Agreement, Oh Dec. Ex. E, ECF No. 171-5.  Assuming that the 2012 Security Agreement is
binding on both parties, CTI has wrongfully detained the specified devices by failing to return
them as required by the contract, thus satisfying all elements of a replevin action under
Connecticut law.

     CTI argues that there was no event of default because CTI did not owe any money to
GEOMC.  As indicated above, this argument is contradicted by the undisputed facts.  CTI's only
remaining defense to these claims is that the 2012 Security Agreement is invalid and not binding
on CTI.  In making this argument, CTI relies on the unanimous board consent issued in 2014,
which purports to rescind the 2012 Security Agreement two years after it was executed, as well
as the subsequent Form 8-K filing.  *See* Written Board Consent in Lieu of Meeting, Weil Dec.
Ex. X, ECF No. 172-14; March 2014 8-K, Weil Dec. Ex. Y, ECF No. 172-15.

     While these documents contain language confirming that, as of 2014, CTI no longer
wished to participate in certain agreements executed by its former CEO Johnie Johnson, the
undisputed facts demonstrate that the 2012 Security Agreement was valid and binding as to both
GEOMC and CTI.  CTI admits that Mr. Johnson was acting as CEO of CTI at the time of the
agreement.  L.R. 56(a)(2) ¶ 14, p. 20.  CTI does not dispute the language of its amended bylaws,
which empowers the CEO to enter into binding contracts on behalf of the company.  Am Bylaws,
Weil Dec. Ex. T, ECF No. 172-10.  The language of the contract itself is careful to ensure that
Mr. Johnson's signature bound CTI as a whole, *see* 2012 Sec. Agreement ¶ 4(d), Oh Dec. Ex. E,

ECF No. 171-5, and GEOMC's security interest under this agreement was confirmed through public filings filed on behalf of CTI following the agreement's execution, *see* UCC-1 Statement, Oh Dec. Ex. G, ECF No. 171-7. CTI's own factual allegations confirm that CTI never directly challenged this agreement until years after its execution, despite having knowledge of the agreement's existence.

GEOMC argues that, based on these undisputed facts, Johnie Johnson, as CEO of CTI, had both actual and apparent authority to bind CTI through his execution of the 2012 Security Agreement. Pl. Mem. in Supp. at 18-23, ECF No. 170.[17] "'[I]t is a general rule of agency law that the principal in an agency relationship is bound by, and liable for, the acts in which his agent engages with authority from the principal, and within the scope of the agent's employment.... An agent's authority may be actual or apparent.'" *Ackerman v. Sobol Family P'ship, LLP*, 298 Conn. 495, 508 (2010) (quoting *Maharishi Sch. Vedic Scis., Inc. v. Connecticut Constitution Assocs. Ltd. P'ship*, 260 Conn. 598, 606 (2002)); *see also Creedon Controls, Inc. v. Banc One Bldg. Corp.,* 470 F. Supp. 2d 457, 460 (D. Del. 2007) ("A principal is liable for the actions of its agent that are within the scope of the agent's actual or apparent authority.").

The Court agrees that Mr. Johnson had actual authority to bind CTI to the 2012 Security Agreement. "Actual authority is created by words or conduct of the principal, which reasonably cause the agent to determine that the principal wishes the agent to act on the principal's behalf." *Creedon Controls*, 470 F. Supp. 2d at 460; *see also LeBlanc v. New England Raceway, LLC*, 116 Conn. App. 267, 275 (2009) ("An agent acts with actual authority when, at the time of taking

---

[17] GEOMC cites Delaware law in support of this argument. CTI does not cite any case law in response, *see* Def. Mem. in Opp. at 17-19, ECF No. 175; however, at oral argument CTI insisted that Connecticut law should govern questions of agency here, not Delaware law. GEOMC contends that the choice of law is immaterial because the common law of both states support a finding that Mr. Johnson had authority to enter into this contract on behalf of CTI. The Court agrees with GEOMC, as both Connecticut and Delaware law clearly support Mr. Johnson's authority based on the undisputed facts at issue here.

action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent to so act.") (internal quotations and marks omitted). "Actual authority may be express or implied." *Maharishi,* 260 Conn. at 607.

Here, it is undisputed that Johnie Johnson was the acting CEO of CTI at the time of entering the 2012 Security Agreement. The corporation explicitly authorized Mr. Johnson to enter into binding contracts on behalf of CTI in its amended bylaws, which unequivocally state that "the CEO … shall have the power on behalf of the Corporation to execute and deliver all contracts, instruments, conveyances or documents and to affix the corporate seal thereto." Am Bylaws, Weil Dec. Ex. T, ECF No. 172-10. Mr. Johnson regularly signed public filings with the Securities and Exchange Commission ("SEC") without any record of those actions being challenged by the Board of Directors. *See* 2010 SEC 8-K, Weil Dec. Ex. M, ECF No. 172-3; 2011 SEC 8-K, Weil Dec. Ex. Q, ECF No. 172-7; 2012 SEC 8-K, Weil Dec. Ex. N, ECF No. 172-4; 2012 SEC 10-Q, Weil Dec. Ex. P, ECF No. 172-6. Furthermore, GEOMC has established that the 2012 Security Agreement was drafted with the assistance of CTI's counsel at the time, and although CTI has not explicitly admitted that this was the case, CTI has not presented any evidence to contradict this conclusion. L.R. 56(a)(1) ¶¶ 34-35.

Thus, there is no genuine dispute of material fact that Mr. Johnson had the implied authority, if not the express authority, to enter into the 2012 Security Agreement on behalf of CTI. *See Gordon v. Tobias*, 262 Conn. 844, 850 (2003) ("Implied authority is a fact to be proven by deductions or inferences from the manifestations of consent of the principal and from the acts of the principal and the agent.") (internal quotations and marks omitted); *Montgomery v. Achenbach*, No. CIV.A. 04C-22-048WLW, 2007 WL 3105812, at *2 (Del. Super. Ct. July 26,

2007) (implied authority "may be proved by evidence of acquiescence [of the principal] with knowledge of the agent's acts, and such knowledge and acquiescence may be shown by evidence of the agent's course of dealing for so long a period of time that acquiescence may be assumed."). As principals are bound by the actions of their duly authorized agents, CTI may not retroactively reject the 2012 Security Agreement based on Mr. Johnson's claimed lack of authority.

Even if Mr. Johnson did lack actual authority to enter into this agreement on behalf of CTI, the undisputed evidence confirms that he had apparent authority to do so. "Apparent authority is that semblance of authority that a principal, through its own acts or inadvertences, causes or allows third persons to believe the principal's agent possesses." *Maharishi*, 260 Conn. at 607. "[M]anifestations of apparent authority may take many forms. For example, the principal may make a manifestation of apparent authority by… placing the agent in charge of a transaction or situation. Connecticut courts likewise have recognized that the basis of apparent authority may be a course of dealing between the agent and the principal." *Ackerman*, 298 Conn. at 515 (internal quotations and marks omitted). "[W]hen, in the usual course of the business of a corporation, an officer or agent has been allowed to manage certain of its affairs, and when this is known to the other party to the contract, the authority of the officer to act for the corporation is implied from the past conduct never challenged by the corporate officials… If the Board of Directors of a corporation permits the corporate officers to assume power and authority in their dealings with third persons, the directors will be deemed to have clothed the officers with authority to bind the corporation by contracts entered into under that authority." *Hessler, Inc. v. Farrell*, 226 A.2d 708, 711-12 (Del. 1967).

Here, GEOMC has established that CTI held out Mr. Johnson to third parties as its agent during the time frame of the 2012 Security Agreement. As noted previously, Mr. Johnson regularly signed public filings on behalf of the company from 2010 to 2012. Mr. Johnson also signed a UCC-1 Financing Statement following the execution of the 2012 Security Agreement, which was received and reviewed by members of the CTI Board of Directors. Oh Dec. Ex. G, ECF No. 171-7; L.R. 56(a)(1) ¶ 44. The CTI Board of Directors never formally challenged the validity of any of these actions until its written resolution in 2014. Thus, Mr. Johnson's apparent authority is clear from the undisputed facts and the record evidence.

CTI's argument that the 2012 Supply Agreement was *ultra vires* and invalid is unsupported by the governing case law.[18] There is nothing in the record suggesting that Mr. Johnson acted outside of his authority when he executed the 2012 Security Agreement in his capacity as CEO of CTI.[19] *See In re Grand Union Co*., 219 F. 353, 363 (2d Cir. 1914) (noting that "[u]ltra vires contracts are contracts which are beyond the statutory powers of the corporation"); *Waterbury Gaslight Co. v. Walsh*, 228 F. 54, 56 (D. Conn. 1915) (lease agreement not invalid as *ultra vires* act where contract did not result in change to the business, lease indicated that it was duly authorized, and agreement had been partially performed).

The 2014 written statement of CTI's Board of Directors expresses concern that Johnie Johnson "may have acted contrary to the best interest of the Company and its stockholders in connection with certain contracts, agreements, initiatives or other actions…." However, "contract law … generally 'forbids a purchaser to repudiate his promises simply because he later

---

[18] The Court notes that CTI does not cite any case law in its briefs on this question.

[19] CTI states that the Board was not notified about this agreement at the time of its execution and that the Board did not vote on the contract before it was signed. However, as noted previously, the Amended Bylaws of CTI unequivocally empower the CEO to enter into contracts on behalf of the corporation, and they do not explicitly require such Board approval in order for such contracts to be binding on the company. Am Bylaws, Weil Dec. Ex. T, ECF No. 172-10.

becomes dissatisfied with the bargain he has made.'" *Rates Tech. Inc. v. Speakeasy, Inc.*, 685 F.3d 163, 167 (2d Cir. 2012) (quoting *Lear, Inc. v. Adkins*, 395 U.S. 653, 668 (1969)); *see also Wooldridge v. Exxon Corp.*, 39 Conn. Supp. 190, 194 (Super. Ct. 1984) ("Rescission is inappropriate to relieve a party of a bargain, freely negotiated, which has proved less attractive than was hoped.").

Apart from CTI's documented conclusion, nearly two years later, that the agreement did not serve the best interests of the company, CTI has not offered any evidence suggesting that the 2012 Security Agreement was invalid. Accordingly, there is no genuine dispute of material fact as to whether CTI was bound by this agreement, and summary judgment is granted to GEOMC with respect to its replevin and wrongful detention claims.

## C. Conversion

GEOMC also alleges that CTI's violation of the 2012 Security Agreement constituted the tort of conversion under Connecticut Law. Sec. Am. Coml. ¶¶ 65-70. "The tort of '[c]onversion occurs when one, without authorization, assumes and exercises ownership over property belonging to another, to the exclusion of the owner's rights.'" *News Am. Mktg. In-Store, Inc. v. Marquis*, 86 Conn. App. 527, 544 (2004), *aff'd*, 276 Conn. 310 (2005) (quoting *Wellington Systems, Inc. v. Redding Group, Inc.*, 49 Conn. App. 152, 169, *cert. denied*, 247 Conn. 905 (1998)). "In addition, conversion requires that the owner be harmed as a result of the unauthorized act." *Id.*

"To succeed in [a] suit for conversion, the plaintiff [is] required to allege and prove legal ownership or the immediate superior right of possession to the [property] in question and that the defendant exercised unauthorized dominion over the [property] to the exclusion of the plaintiff's rights." *Dewitt v. Manulik*, 176 Conn. 657, 662 (1979); *see also News Am. Mktg.*, 86 Conn. at

545 ("To establish a prima facie case of conversion, the plaintiff had to demonstrate that (1) the material at issue belonged to the plaintiff, (2) that [the defendant] deprived the plaintiff of that material for an indefinite period of time, (3) that [the defendant]'s conduct was unauthorized and (4) that [the defendant's] conduct harmed the plaintiff.").

As explained above in connection with GEOMC's replevin and wrongful detention claims, the undisputed facts establish that CTI did deprive GEOMC of medical devices in which GEOMC had a legitimate possessory interest, such deprivation was without legal authorization, given the clear terms of the 2012 Security Agreement, and it resulted in harm to GEOMC. Thus, summary judgment is appropriate as to GEOMC's conversion claim.

### D. Unjust Enrichment

GEOMC claims that, as a matter of law, CTI's retention of the devices in violation of the 2012 Security Agreement constituted the tort of unjust enrichment under Connecticut law. "In order to succeed on a claim for unjust enrichment under Connecticut law, a party must show '(1) that the defendants were benefitted, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment.'" *Godina v. Resinall Int'l, Inc.*, 677 F. Supp. 2d 560, 575 (D. Conn. 2009) (quoting *Vertex, Inc. v. Waterbury*, 278 Conn. 557, 573 (2006)).

For the same reasons outlined in connection with GEOMC's claims for replevin, wrongful detention and conversion, these elements are satisfied based on the undisputed facts. Accordingly, summary judgment is granted with respect to GEOMC's claim for unjust enrichment.

## E.  CUTPA

Finally, GEOMC alleges that CTI's actions violated the Connecticut Unfair Trade Practices Act ("CUTPA").  This statute prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Conn. Gen. Stat. § 42-110b.  "Connecticut has adopted the [Federal Trade] Commission's 'cigarette rule' to determine whether a practice is unfair under CUTPA.  The factors to be weighed…are '(1) [w]hether the practice, without necessarily having been previously considered unlawful, offends public policy…; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers.'"  *Fabri v. United Techs. Int'l, Inc*., 387 F.3d 109, 120 (2d Cir. 2004) (quoting *Cheshire Mortgage Serv. Inc. v. Montes*, 223 Conn. 80, 106 (1992)).

"A simple breach of contract cannot constitute a violation of the Connecticut Unfair Trade Practices Act… There must be significant aggravating circumstances."  *Boulevard Assocs. v. Sovereign Hotels, Inc*., 72 F.3d 1029, 1040 (2d Cir. 1995); *see also Greene v. Orsini*, 50 Conn. Supp. 312, 315 (Super. Ct. 2007) ("A simple breach of contract does not offend traditional notions of fairness and, standing alone, does not offend public policy so as to invoke CUTPA. A CUTPA claim lies where the facts alleged support a claim for more than a mere breach of contract. Depending upon the nature of the assertions, however, the same facts that establish a breach of contract claim may be sufficient to establish a CUTPA violation.").

The conduct alleged on the part of CTI essentially amounts to a deliberate refusal to honor its obligations under the contract.  While this conduct, based on the undisputed facts in this case, gives rise to various common law claims identified above, GEOMC has not specified any aggravating factors that go beyond CTI's violation of the contractual terms.  Under Second

Circuit case law, this is insufficient to constitute a CUTPA violation.[20] *See Boulevard Assocs.,* 72 F.3d at 1040; *W. World Ins. Co. v. Architectural Builders of Westport, LLC*, 520 F. Supp. 2d 408, 414 (D. Conn. 2007) ("[A] simple violation of the Policy, which is a contract, would be insufficient to establish a CUTPA claim."); *City of Bridgeport v. Aerialscope, Inc.*, 122 F. Supp. 2d 275, 278 (D. Conn. 2000) ("To reiterate, generally, a breach of contract action does not constitute a claim under CUTPA.).

GEOMC has failed to establish the absence of a genuine dispute of material fact with respect to CTI's liability under CUTPA. In order to prevail on this claim, GEOMC must demonstrate the presence of aggravating factors in connection with CTI's violation of the 2012 Security Agreement, and the undisputed facts of this case do not support such a finding at this stage. Accordingly, summary judgment is denied as to this claim.

## IV.    CONCLUSION

GEOMC's [169] Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART**. With respect to GEOMC's breach of contract claim, the motion is GRANTED as to the narrow question of whether CTI breached the 2007 Security Agreement and subsequent amendments by failing to pay GEOMC for the 61 devices sold after 2011. A genuine dispute of material fact remains, however, as to whether CTI is liable for additional devices beyond those sold after 2011, as well as whether payments should be adjusted to account for overpayments on the part of CTI and/or sales made by GEOMC in Korea under the 2008

---

[20] In GEOMC's memorandum of law in support of its motion for summary judgment, GEOMC cites *Halloran v. Spillane's Servicenter, Inc.*, 41 Conn. Supp. 484 (Super. Ct. 1990), for the proposition that conversion is a violation of CUTPA. The conversion at issue in that case, however, was a towing company's established practice of refusing to release vehicles until various services were fully paid for, without regard to special circumstances. *Id.* The facts of that case are distinguishable from the facts here, where the plaintiff's possessory interest in the converted property arose from a contractual agreement, and the only misconduct alleged on the part of the defendant was its refusal to recognize that contractual interest.

Distributor Agreement.  Therefore, the motion is DENIED as to the scope of CTI's liability and the specific amount of damages owed.

The motion is GRANTED as to GEOMC's claims for replevin, wrongful detention, conversion, and unjust enrichment under the 2012 Security Agreement.  The extent of damages in connection with these various claims will be determined at trial. The motion is DENIED with respect to GEOMC's CUTPA claims.

SO ORDERED this 18th day of August, 2017 at Bridgeport, Connecticut.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE