UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| GEOMC CO., LTD., | : |
|     Plaintiff, | : |
| | :     CIVIL ACTION NO. |
| v. | :     3:14-cv-01222 (VAB) |
| | : |
| CALMARE THERAPEUTICS, | : |
| INCORPORATED, | : |
|     Defendant. | : |

**MEMORANDUM AND ORDER**

GEOMC Co., Ltd. ("Plaintiff," or "GEOMC") brought this case against Calmare Therapeutics, Incorporated ("Defendant," or "CTI"), claiming that CTI failed to pay for or return certain medical devices that GEOMC manufactured and supplied to CTI. Complaint, ECF No. 1; Sec. Am. Compl., ECF No. 137. The parties filed proposed findings of fact and conclusions of law on September 20, 2017, and the Court held a bench trial from September 25, 2017 through September 26, 2017. During the course of this trial, two witnesses testified and 22 exhibits were admitted into evidence.[1]

The Court now sets forth its findings of fact and conclusions of law under Federal Rule of Civil Procedure 52(a)(1), and, as explained below, finds for Plaintiff. CTI is ordered to pay $4,673,406 plus interest at the rate of eighteen (18%) per annum from December 31, 2010 to the

---

[1] Although CTI did not request to read any deposition testimony into the record during the bench trial, CTI separately seeks to admit excerpts of deposition testimony from three additional witnesses: Johnnie Johnson, CTI's former Chief Executive Officer ("CEO"); Carl O'Connell, another former CEO of CTI; and Young H. Lim, CTI's current CEO. Joint Trial Mem. at 19, ECF No. 190. GEOMC objects to the admission of all designated deposition testimony. *See id.* at 20. Having reviewed the proposed testimony, the Court admits all affirmatively designated deposition testimony and all cross-designations, with the exception of the following excerpts from the deposition of Young H. Lim: pages 82:15-90:19; 95:5-98:9; and 111:5-113:21. The excluded testimony relates to either (a) sales made in Korea, a topic which the Court specifically precluded from this case under the Court's motion *in limine* ruling, *see* Ruling, ECF No. 204, or (b) CTI's interactions with third party companies in connection with the devices, which the Court precluded during the context of trial.

date of the entry of judgment in this case. CTI also must pay attorney's fees and costs to be determined based on filings to be filed, as provided below.

If CTI fails to make full payment by December 31, 2017, CTI is ordered to return all remaining devices in its possession to GEOMC. GEOMC may sell the returned devices and apply the proceeds towards the satisfaction of CTI's judgment. Once CTI's judgment has been satisfied by these sales, any devices that have not been sold must be returned to CTI and any proceeds above and beyond the amount necessary to satisfy the monetary judgment above also shall be provided to CTI.

## I. FINDINGS OF FACT[2]

GEOMC, formerly known as Daeyang E&C Co., Ltd., is a South Korean corporation that manufactures, distributes and sells medical devices. Summ. J. Ruling at 2, ECF No. 187. Calmare Therapeutics, Incorporated ("CTI"), formerly known as Competitive Technologies, Inc., is a Delaware corporation with its principal place of business in Connecticut. *Id.* A substantial portion of GEOMC's business involves certain pain management devices ("devices").

Beginning in 2007, GEOMC and CTI entered into an agreement whereby GEOMC would manufacture and supply devices to CTI in exchange for payment. *Id.* at 2-7. CTI, however, failed to make full payment for those devices. *Id.* at 23. As explained in further detail below, CTI now owes GEOMC a total of $4,673,406 for the unpaid devices, plus interest and attorney's fees and costs.

---

[2] The Court substantially narrowed the factual issues remaining before it in its summary judgment ruling dated August 18, 2017. ECF No. 187. The Court's ruling established CTI's liability as to GEOMC's breach of contract, replevin, wrongful detention, conversion and unjust enrichment claims, leaving only damages to be determined at trial with respect to those claims. The following findings of fact incorporate the undisputed facts reflected in that ruling as well as the Court's findings of fact based on the evidence presented at trial.

### A. 2007 Agreement and Subsequent Amendments

In October 2007, GEOMC and CTI entered into a "Territory Exclusive License Agreement for Intellectual Property" ("2007 Agreement"). *Id.*; 2007 Agreement, Pl. Ex. 1. Under the terms of this contract, GEOMC agreed to manufacture devices and supply them to CTI in exchange for payment. *Id.*

The language of the 2007 Agreement explicitly provides for profit-sharing between GEOMC and CTI in connection with sales of the devices: "DAEYANG [(GEOMC)] and CTT [(CTI)] will share profits of 50% each from sales of Licensed Products produced by DAEYANG." Pl. Ex. 1 at ¶ 3.2. The agreement also provides that "[p]ayments of royalties shall be made in United States Dollars within thirty (30) days following the end of each monthly royalty period, and such payments shall include all royalties that have accrued during said monthly period." *Id.* at ¶ 4.2. Under the 2007 Agreement, therefore, CTI is obligated to pay GEOMC 50% of the sale price of any devices sold at the end of each month. *Id.*

#### 1. Amendments to 2007 Agreement and Timing of Payment

Seung Bun Oh, Executive Vice President of GEOMC, testified at trial that, although the terms of the 2007 Agreement clearly provided for 50/50 profit-sharing between the parties, the terms remained ambiguous as to the exact mechanism for payment. The agreement is silent, for example, as to how the sales price would be determined, or when sales must be made. In order to bring more clarity to the payment arrangement between the parties, Mr. Oh entered into negotiations on behalf of GEOMC with John Nano, then Chief Executive Officer ("CEO") of CTI.

As a result of those negotiations, the parties entered into a Memorandum of Understanding ("MOU") in January 2010 ("2010 MOU"), which modified the payment

mechanism outlined in the 2007 Agreement. 2010 MOU, Pl. Ex. 2. The written terms of the 2010 MOU provide that "GEOMC will receive $9,000 for the sale of each unit" instead of receiving a fifty per cent share of sale proceeds. *Id.* The 2010 MOU was signed by John B. Nano, CTI's President and CEO at the time, and Young H. Lim, GEOMC's President and CEO at the time. *Id.*

While the specific timing of payment is not written into the language of the 2010 MOU, Mr. Oh testified that he discussed the timing of payment with Mr. Nano during the course of negotiations. He testified that the parties mutually understood and agreed that the $9,000 flat fee per device would be paid upon delivery of the devices, not upon sale.[3] Mr. Oh further confirmed that the parties never agreed to allow CTI to retain the devices indefinitely.

The following year, in April 2011, GEOMC and CTI entered into an additional agreement, which increased the price from $9,000 per device to $10,000 per device. Summ. J. Ruling at 4, ECF No. 187. Mr. Oh testified that this second MOU did not change the parties' mutual understanding that payment was due upon delivery of the devices. This second adjustment to the 2007 Agreement was negotiated between Mr. Oh and Johnnie Johnson, who had replaced John Nano as CTI's CEO at the time. Although it was never memorialized in a written agreement, neither party disputes that the 2007 Agreement was updated in 2011 to increase the price per unit from $9,000 to $10,000. *Id.*

---

[3] CTI initially contested this notion, arguing that the changes to the 2007 Agreement never provided that payment was owed on delivery, but only after devices were sold. *See* Def. Prop. Findings at 2, ECF No. 202. CTI submitted deposition testimony from two former CEOs, Johnnie Johnson and Carl O'Connell, stating that CTI's understanding was the payment was only due after the devices were sold. *See* Johnson Dep., 64:18-65:20; O'Connell Dep., 62:16-64:5. This testimony, however, is contradicted by CTI's own public filings with the Securities and Exchange Commission ("SEC"), which consistently list over $4 million in accounts payable to GEOMC as "current liabilities." *See* SEC Form 10-K Filings, Pl. Ex. 28 at 30, Pl. Ex. 29 at 29; Pl. Ex. 30 at 30; Pl. Ex. 31 at 28; Pl. Ex. 32 at 24. Accordingly, the Court finds that the parties intended for payment upon delivery of the devices rather than after completion of sale.

4

## 2. CTI Payment Issues

Mr. Oh testified that, by 2011, CTI had already begun falling behind on its payment obligations to GEOMC under the applicable agreements. In support of this testimony, GEOMC submitted documentation in connection with a review of GEOMC's financial accounts performed by auditors KPMG Samjong Accounting Corporation ("KPMG"). KPMG Audit Doc., Pl. Ex. 24. This documentation includes a confirmation of total accounts payable from CTI to GEOMC as of June 10, 2011, signed by Johnnie Johnson on behalf of CTI and provided to KPMG in connection with KPMG's review of GEOMC's accounts. *Id.* Together with this confirmation, Mr. Johnson submitted a written addendum to KPMG, dated August 3, 2011, stating as follows: "Based on an agreement of $9,000 per unit with GEOMC, we confirm that the Account Payable amount due to GEOMC as a net basis is $3,858,402 as of June 10, 2011 for the account settlement." *Id.* He also committed on behalf of CTI to begin making consistent monthly payments to GEOMC in order to pay down this debt, stating specifically that CTI "plans to make a payment of $200,000 per month for the rest of 2011 and increases to $300,000 per month from 2012." He noted that CTI "could pay more amounts to pay off the account balance at the earliest as the sales of the [devices] is expected to grow...." *Id.*

GEOMC also submitted an e-mail exchange between Mr. Oh and Mr. Johnson, which followed Mr. Johnson's written description of amounts owed and CTI's related payment plan. 2012 E-Mails, Pl. Ex. 23. This document shows that, on March 29, 2012, Mr. Oh wrote to Mr. Johnson to confront him regarding GEOMC's concerns about the lack of payment from CTI. *Id.* In his e-mail, Mr. Oh referenced an agreed-upon "minimum payment each month from [CTI,]" noting on behalf of GEOMC that it was "very alarming that we have not received any fund[s] since last December." *Id.* In response to Mr. Oh's e-mail, Mr. Johnson did not deny liability or

5

contest his agreement to make monthly payments; instead, he responded succinctly as follows: "We are waiting for funds and currently have no funds to wire. Will keep you updated. Johnie." *Id.*

Contrary to CTI's submissions at the summary judgment stage and in its proposed findings of fact, CTI did not present any evidence at trial that they over-paid GEOMC at any point, or that CTI made block payments as an accommodation to GEOMC's financial troubles. *See* Summ. J. Ruling at 5, ECF No. 187; Def. Prop. Findings of Fact at 7, ECF No. 202. Rather, the record evidence confirms that CTI failed to satisfy its payment obligations to GEOMC beginning in or around 2011, resulting in a substantial accumulation of money owed from CTI to GEOMC. Pl. Exs. 23-24.

### 3. GEOMC Records Regarding Payments Owed

At trial, the parties presented conflicting evidence regarding exactly how much money was owed from CTI to GEOMC in connection with these medical devices. Mr. Oh testified that GEOMC maintained regular records of all devices shipped to CTI, including the number of devices shipped, the price for those devices, the amounts owed by CTI in connection with each shipment, and the total amounts owed by CTI over time. GEOMC Accounting, Pl. Ex. 4. Mr. Oh confirmed that GEOMC's accounting team consistently maintained these records based on invoices and shipping records. He further confirmed that the accounting team provided him with charts for his review after each shipment and at least once a month, at the end of each month.

GEOMC's Exhibit 4, a business record prepared by GEOMC's accounting team, lists all devices shipped to CTI, from the first shipment in September 2008 until the last shipment in 2013. *Id.* These records demonstrate that a total of 691 devices were shipped from GEOMC to CTI: 5 devices in 2008, 84 devices in 2009, 461 devices in 2010, 132 devices in 2011, and 9

6

devices in 2013. *Id.* According to GEOMC's calculations, as well as inventory records from the warehouses in which the unsold devices are stored, CTI has sold or otherwise disposed of 307 of the 691 devices to date, retaining a total of 384 devices in inventory. *Id.*; Inventory Records, Pl. Ex. 33.

CTI has paid GEOMC a total of $2,098,850, accounting for some, but not all, of the devices sold by CTI through 2011. CTI Interrogatory Responses at 7, Pl. Ex. 7. It is undisputed that CTI made no payments at all after 2011, despite CTI's written acknowledgement in August 2011 that it owed substantial amounts to GEOMC and CTI's commitment to make monthly payments beginning in 2011. *Id.*; Pl. Ex. 24. GEOMC's records confirm that, taking into account the partial payment made by CTI before 2011, the total sum owed by CTI to GEOMC is $4,673,406. Pl. Ex. 4.

CTI has failed to meaningfully challenge these calculations. During closing argument, CTI conceded its liability to GEOMC in the amount of $4,257,320, but denied that it owes the higher amount of $4,673,406. In support of this argument, during trial CTI presented the testimony of its current Chief Financial Officer ("CFO"), Thomas Richtarich. Mr. Richtarich, who joined CTI only recently, in 2016, was unable to confirm or deny the accuracy of the accounting methods reflected in GEOMC's Exhibit 4.[4] At trial, Mr. Richtarich detailed CTI's calculation of its alleged liability, explaining that, assuming the accuracy of Johnnie Johnson's written statement that CTI owed $3,858,402 as of June 10, 2011, *see* Pl. Ex. 4, and incorporating GEOMC's calculations as of June 17, 2011, *see* Pl. Ex. 24, CTI's resulting liability as of the last

---

[4] Mr. Richtarich's testimony mostly focused on the market value of the devices. He testified that the average sale price for a device was around $95,664. The sale price of these devices in the market is not at issue in this case, however, as it is undisputed that CTI agreed to pay GEOMC a flat fee of either $9,000 or $10,000 per device and, based on the 2010 and 2011 updates to the 2007 Agreement, the amounts owed by CTI did not depend on the final sale price of the devices.

7

device shipment would be approximately $4,257,320. It is unclear, however, whether this calculation appropriately accounts for a large shipment noted in GEOMC's records, dated June 3, 2011, which resulted in a liability of $500,000. Pl. Ex. 4. Furthermore, as Mr. Richtarich did not join CTI until 2016, he was unable to confirm the accuracy of Mr. Johnson's assertion that CTI owed $3,858,402 as of June 10, 2011.

CTI presented limited independent records of devices shipped and amounts owed between the parties during the applicable time period. CTI presented inventory records of all devices in CTI's possession. CTI Inventory, Def. Ex. 4. This inventory included a listing of specific devices that were designated as "consigned," meaning that they were either provided to customers free of charge for evaluation or clinical trial, provided to salespeople for use as samples or demo devices, or sent away for repair. *Id.* at 1. According to these records, "consigned" devices totaled 37 as of the end of 2016. *Id.* CTI claims that it does not owe GEOMC for these devices, since they will not ultimately be sold on the market. CTI did not present any testimony or documentation, however, demonstrating an agreement between the parties regarding the consignment of these devices, nor did CTI present any evidence that it was authorized under the amended 2007 Agreement to designate devices for "consignment" unilaterally without paying for those devices.[5]

In addition to this inventory, CTI submitted a spreadsheet which allegedly contained records of all devices sold by CTI from 2009 through 2016 and all payments made to GEOMC for devices. CTI Records, Def. Ex. 5. This record was prepared before Mr. Richtarich took on the role of CFO at CTI, and Mr. Richtarich was not involved in its creation. According to this

---

[5] Furthermore, Mr. Oh testified that GEOMC's calculations do not include any devices that were determined to be defective and returned for repair. Thus, GEOMC's calculation of a $4,673,406 liability has already taken those devices into account.

8

record, cumulative sales as of 2016 totaled 230, a lower figure than Defendants reported in their interrogatory responses and a lower figure than what is reflected in the warehouse records. Pl. Exs. 7, 33. Mr. Richtarich did not provide any explanation for this discrepancy.

Accordingly, in light of the testimony and documentation presented at trial, the Court finds that GEOMC has proven by the preponderance of the evidence that CTI's current liability for devices shipped to date is approximately $4,673,406.

### B. 2012 Security Agreement

In May 2012, after CTI had begun defaulting on its payment obligations to GEOMC under the 2007 Agreement as amended, the parties entered into a "Security Agreement" regarding the devices ("2012 Security Agreement"). 2012 Sec. Agreement, Pl. Ex. 3. The terms of this agreement granted GEOMC a security interest in the following identified "collateral": "273 Calmare devices located in the Company's warehouse located at… Stratford, CT" as well as "120 devices located in the Company's warehouse located at… Charlotte, NC," a total of 393 devices. *Id.* at ¶ 2. The applicable warehouse inventory records confirm that, due to additional device sales since the execution of the 2012 Security Agreement, CTI now possesses only 384 devices. Pl. Ex. 33.

The agreement specifies several "events of default" that would trigger GEOMC's security interest, including the "failure of the Company to pay any of the amounts due under the Obligations as and when due and payable." *Id.* at ¶ 8(a). If an event of default occurs under the agreement, GEOMC may "declare the unpaid balance of any Obligations to be immediately due and payable" and it may require CTI to "assemble the Collateral and make it available to Supplier[.]" *Id.* at ¶ 9.

In addition to accelerated payment and replevin of the devices in CTI's possession, the 2012 Security Agreement also entitles GEOMC to the payment of attorney's fees in the event of default: "The Company shall pay on demand all costs and expenses, including, without limitation, reasonable attorney's fees and expenses, incurred by or on behalf of Supplier ... in enforcing the Obligations...." *Id.* The 2012 Security Agreement further entitles GEOMC to 18% interest per annum on any amounts determined to be due under the agreement. *Id.* ("All of such costs and expenses ... together with interest at a per annum rate of interest which is equal to 18% per annum, shall be paid by the Company to Supplier on demand and shall constitute and become a part of the debt secured hereby.")

In the Court's summary judgment ruling, the Court determined that, based on CTI's failure to fulfill its payment obligations under the 2007 Agreement as amended, CTI is liable to GEOMC under this agreement, and GEOMC is entitled to replevin of all devices in CTI's possession as a result. Summ. J. Ruling at 23-31. To date, CTI has not returned any of the 384 devices currently in its inventory. Pl. Ex. 33.

## II. CONCLUSIONS OF LAW

In GEOMC's Second Amended Complaint, GEOMC alleges several claims against CTI under various provisions of Connecticut law, including: (1) replevin; (2) wrongful detention under Conn. Gen. Stat. § 52-515; (3) conversion; (4) Connecticut Unfair Trade Practices Act ("CUTPA"); (5) Unjust Enrichment; and (6) Breach of Contract. Sec. Am. Compl., ECF No. 137. In the Court's August 18, 2017 summary judgment ruling, the Court determined that CTI was liable to GEOMC as a matter of law for breach of contract, replevin, wrongful detention and

unjust enrichment, reserving judgment only on questions of appropriate damages under the applicable contractual agreements between the parties. Summ. J. Ruling, ECF No. 187.[6]

As discussed above, the Court has determined that (1) under the 2007 Agreement, as amended, CTI had a contractual obligation to pay GEOMC upon delivery of each device shipped to CTI, and (2) CTI has failed to pay GEOMC a total of $4,673,406 for devices shipped under the 2007 Agreement as amended. The Court has also determined that, under the 2012 Security Agreement, GEOMC is contractually entitled to the return of all devices maintained by CTI in light of CTI's failure to make full payment for the devices, as well as prejudgment interest at a rate of 18% per year and reasonable attorney's fees and costs. Having established the scope of CTI's liability under the facts of this case, the Court now sets forth its conclusions of law regarding the appropriate relief.

"In an action for breach of contract, the general rule is that the award of damages is designed to place the injured party, so far as can be done by money, in the same position as that he would have been in had the contract been performed." *Flater v. Grace*, 291 Conn. 410, 426 n. 11 (2009) (internal quotations and marks omitted). In accordance with this principle, Connecticut law provides that "a litigant may recover just damages for the same loss only once." *Haynes v. Yale-New Haven Hosp.*, 243 Conn. 17, 23 (1997).

CTI argues that this prohibition against "double recovery," *see id.*, prevents the Court from enforcing the 2012 Security Agreement and granting GEOMC the replevin of all devices in CTI's possession. According to CTI, because CTI was able to sell the devices to the public for an average price of $95,664 per device, the replevin of all 384 devices in CTI's possession would

---

[6] The Court denied GEOMC's motion for summary judgment as to its CUTPA claim. *Id.* GEOMC, however, did not present any evidence related to this claim at trial. Thus, the Court considers this claim to be abandoned. The Court also dismisses CTI's sole counterclaim, which alleges that GEOMC received an overpayment of $32,000.

11

inappropriately award GEOMC recovery far in excess of the amount owed by CTI. *See, e.g. Commercial Credit Corp. v. Miron*, 108 Conn. 524, 143 A. 846, 847 (1928) (noting in replevin case involving an automobile that deprived party was "entitled to fair and reasonable compensation for loss of use of the automobile," requiring consideration of "the value of the automobile, the market value of the use of which the owner has been deprived, and the cost to the owner of the exercise of that use under the conditions surrounding his enjoyment of it"). Thus, CTI proposes that the Court order replevin of only a small subset of devices, based on calculations suggesting that GEOMC does not need all devices to recover the amount owed. GEOMC Prop. J. at 4 n. 6, ECF No. 210.

GEOMC, however, repeatedly stated at trial that it is not seeking both a monetary payment and the return of all devices; rather, it seeks no more than a full satisfaction of the $4,673,406 owed by CTI, based on the an agreed-upon value of either $9,000 or $10,000 per device. GEOMC has indicated that this debt could be satisfied either through a monetary payment or, if CTI is unable to pay the amount owed outright, through the return of the devices identified as collateral in the 2012 Security Agreement. GEOMC has proposed that it would return to CTI any devices still remaining after CTI's full liability has been satisfied.

Under Second Circuit case law governing secured instruments, "[a] creditor holding valuable collateral has no right to hold valuable collateral and to collect on the full amount of the debt secured by the collateral." *Warnaco, Inc. v. Farkas*, 872 F.2d 539, 545 (2d Cir. 1989); *see also In re Yale Exp. Sys., Inc.*, 370 F.2d 433, 437 (2d Cir. 1966) (noting that, under the Uniform Commercial Code, "the secured party has the right upon default by the debtor to take possession of the collateral ... and to sell, lease or otherwise dispose of it, applying the proceeds to the indebtedness"). Consistent with this principle, the Court concludes that full recovery of both the

$4,673,406 money judgment and the total remaining collateral in CTI's possession, 384 devices, would not be appropriate relief.

CTI's proposed judgment, however, is untenable and fails to make GEOMC whole. By CTI's own admission, if the Court were to adopt CTI's proposed approach and only order the return of a small subset of the devices in CTI's possession, it would take years for GEOMC to recover the full amount owed through sales of those devices. This result would be inequitable, as it would fail to place GEOMC in the position in which it would have been had CTI not breached its contractual obligations, *see Flater*, 291 Conn. at 426 n. 11 (2009), and it would allow CTI to be unjustly enriched by the retention of hundreds of devices for which it never paid. *See Town of New Hartford v. Connecticut Res. Recovery Auth.*, 291 Conn. 433, 460 (2009) (explaining difference between money damages, which are "intended to provide a victim with monetary compensation for an injury to his person, property or reputation[,]" and restitution, which "aims to deprive a defendant of unjustly obtained benefits").

In accordance with the Court's "broad discretion" to balance equities in the determination of appropriate relief, *cf. Polverari v. Peatt*, 29 Conn. App. 191, 203 (1992) (noting that the "balancing of equities" in connection with the calculation of restitution damages "is a matter within the trial court's broad discretion"), the Court concludes that GEOMC is entitled to the sum of $4,673,406, due and payable immediately, together with a total of 18% prejudgment interest per annum calculated from December 31, 2010 to the date of entry of judgment in this case. *See* 2012 Security Agreement ¶ 9, Pl. Ex. 3; *see also Paulus v. LaSala*, 56 Conn. App. 139, 141 (1999) (affirming trial court's conclusion that, "as a matter of law, prejudgment interest runs until the date of the judgment"). If CTI is unable to satisfy this obligation by December 31, 2017, GEOMC is entitled to the replevin of all devices currently in CTI's possession so that it

may sell those devices until the full debt has been satisfied. After the full amount specified in the Court's judgment has been satisfied, any remaining devices and amounts in excess of those necessary to satisfy CTI's debt shall be returned to CTI.

Under the terms of the 2012 Security Agreement, in addition to the sum of $4,673,406 plus 18% prejudgment interest per annum, GEOMC is entitled to "reasonable attorney's fees and expenses...." 2012 Sec. Agreement ¶ 9, Pl. Ex. 3. The Court may determine these amounts by motion following the entry of judgment. *See* Fed. R. Civ. P. 54(d); *Weyant v. Okst*, 198 F.3d 311, 314 (2d Cir. 1999) (noting that "Rule 54 provides that a party seeking an award of attorneys' fees generally must do so by motion 'filed and served no later than 14 days after entry of judgment.'") (quoting Fed. R. Civ. P. 54(d)(2)(B)); *MacLeod v. Procter & Gamble Disability Benefit Plan*, No. 3:05-CV-725 (MRK), 2007 WL 141956, at *2 (D. Conn. Jan. 18, 2007) ("The movant bears the burden of establishing" reasonable attorney's fees). Accordingly, GEOMC may submit an application for reasonable attorney's fees and costs within 30 days of the entry of judgment in this matter, and CTI will be provided with an opportunity to respond accordingly.

### III. CONCLUSION

The Court finds for GEOMC on GEOMC's claims for breach of contract, replevin, wrongful detention, conversion, and unjust enrichment. GEOMC's CUTPA claim is considered abandoned, and CTI's counterclaim alleging overpayment of $32,000 is hereby dismissed.

The Court finds that GEOMC has proven by a preponderance of the evidence that CTI is liable to GEOMC for $4,673,406 plus a total of 18% prejudgment interest per annum, calculated from December 31, 2010 to today, September 29, 2017. CTI also is liable to GEOMC for attorney's fees and costs yet to be determined. GEOMC may submit an application for reasonable attorney's fees and costs within 30 days of the entry of judgment. All sums owed by

14

CTI must be paid by December 31, 2017.

If CTI fails to make full payment by December 31, 2017, CTI is ordered to return all remaining devices in its possession to GEOMC, up to a total of 393 devices. GEOMC is ordered to sell the returned devices and apply all proceeds towards the satisfaction of CTI's judgment. Any devices that have not been sold after CTI's judgment has been satisfied, together with any proceeds in excess of the amounts owed, must be returned to CTI.

The Clerk of the Court is directed to calculate the amount of prejudgment interest, enter judgment, and close this case. The Court shall retain jurisdiction of this case for the purpose of enforcing the terms of this judgment.

SO ORDERED this 29th day of September, 2017 at Bridgeport, Connecticut.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE